OMAHA STREET RAILWAY COMPANY v. MELVIN BAKER, BY HIS NEXT FRIEND, MARGARET FERRIS.

FILED APRIL 4, 1895.    No. 6190.

Street Railways: NEGLIGENCE OF MOTORMAN: PERSONAL INJURIES: EVIDENCE. The evidence in this case considered, and found not to sustain the verdict upon which judgment was rendered.

ERROR from the district court of Douglas county. Tried below before FERGUSON, J.

*John L. Webster*, for plaintiff in error.

*C. A. Baldwin* and *Weaver & Giller*, contra.

RYAN, C.

On the 15th day of February, 1891, Melvin Baker, a lad between thirteen and fourteen years of age, was per-

manently injured by a car operated by the Omaha Street
Railway Company. In a suit for damages on account of
such injuries there was a verdict and judgment against the
railway company in the district court of Douglas county
for the sum of $2,500. Melvin Baker, as a messenger for
the Western Union Telegraph Company, was required to
take a street car going southward on the Sixteenth street
line. For this purpose he came out of the alley between
Douglas and Farnam streets, across which the Sixteenth
street car line of plaintiff in error ran. The motor train
on which he proposed riding had just passed when Melvin
came out of the alley, and that he might catch it he ran
diagonally in a northwesterly direction across a street rail-
way track and immediately in front of a motor train
thereon, consisting of two cars moving northward. When
the south-bound motor train was nearly opposite the one
bound northward, Melvin with one hand had seized the
hand-hold on the rear of the foremost of the two cars go-
ing southward, and, with the other, the guard rail of the
rear platform of the same car, and was still on the ground,
when, as he claims, the motorman on the train going north-
ward seized him by the neck, caused him to lose his holds
and fall beneath the wheels of the rear car of the north-
bound motor train. It is not necessary to determine
whether or not the plaintiff in error would be liable if its
sole ground of defense was that it was not answerable for
an act of the motorman on the north-bound train entirely
foreign to the scope of his duties. This proposition will
not therefore be discussed. The evidence of the lad as to
the agency which directly caused his fall was as follows:

Q. Had you one foot on the step?

A. No, sir.

Q. What then?

A. I felt something jerk me by the neck and I had to
let loose. The car I had hold of was in motion and I could
not hold on any longer.

Q. What was there, if anything, on the track going north?

A. A motor.  *  *  *

Q. What did you say caused you to let go your hold?

A. Something grabbed me by the neck.  I couldn't say sure it was the motorman, for I don't know whether there was anybody else on the front platform or not.

Q. State what you mean to say.  Whether some person took hold of you by the neck?

A. Yes, sir; some person did.

Q. Where did he take hold of you?

A. Right in in the middle of the neck, on my coat.

Q. Where was the person, whoever it was, that took hold of your clothing by the neck?

A. On the front platform.

Q. Of what?

A. Of the motor.

Q. Going which way?

A. North.

Q. When you let go, under these circumstances, what became of you then?

A. I fell.

Q. Tell the court and jury what condition you fell; that is, after you fell how did you lie?

A. With my head to the south.  *  *  *

Q. Which way was your head?

A. South.

Q. Tell the jury when you fell, and, with your head to the south, whether your face was up or down.

A. Up.

Q. What then happened to you after you fell and were on the ground and lying in that condition?

A. I just felt the wheel hit my arm; it just held there for a little while and then passed on over.

Q. Which arm did it catch?

A. The right arm.

37

It is not questioned that the boy's arm was very seriously injured by the wheel passing over it in the manner described. On his cross-examination, the testimony of Melvin was that he did not have a chance to look back to see who had caught him by the neck; that he did not see who it was behind him that caught hold of him and did not know where the person was standing that "grabbed hold" of him. Mrs. Dale was a witness for the plaintiff in the district court and testified that with her husband she was riding on the west side of the foremost car of the motor train going northward, and that, looking out of the front window, she saw the boy crossing the track toward the northwest; that she was somewhat scared by his attempting to cross the track with the north-bound train so close, moving toward him; that it was evident to her that he could not cross both tracks before the south-bound train would reach him; that it was her impression that no one was on the front platform of the car on which witness was riding except the motorman; that when she saw the boy crossing the track he was about ten or fifteen feet ahead of the car in which she was riding. The testimony of Mrs. Dale's husband was in substantial accord with that of his wife, though he ventured no statement as to any one being with the motorman on the platform. In addition to what his wife had sworn he testified that after the boy had crossed the track in front of the train on which the witness was riding he did not see the boy, and that "almost immediately the other car held up and ours put on the brakes, and I heard a cry, a boy cry at the rear end of our car—of our train." The motorman of the north-bound train testified that when the boy crossed in front of him he not only set the brake but reversed his motor to avoid injuring the boy, and that he did not take hold of him in any manner whatever. In relation to the efforts of the motorman to avoid running against the boy while he was crossing the track there is no question made, for whatever the degree of care was which

was exerted it was conceded that the result was that he
reached the south-bound train uninjured—such efforts if
made, however, precluded the possibility of his seizing the
boy. The right of recovery on plaintiff's own theory was
wholly dependent upon the establishment of the alleged mis-
conduct of the motorman of the north-bound train in caus-
ing the boy to lose his holds on the car moving southward.
The evidence of the boy, bearing upon this proposition, has
been quite fully set out, because he alone gave testimony to
establish it. It must be conceded from his own statements
that he did not attempt to take the car at the street cross-
ing, the only place at which stops were made to receive pas-
sengers. From his testimony, taken as a whole, it does
not appear that he testified that the motorman seized him,
as of a fact of which he had knowledge. On the contrary,
he expressly admitted that he could not say who it was, but
apparently argumentatively he asserted that it was the
motorman of the north-bound train. No one else testified
on this subject but the motorman himself, and he flatly de-
nied that he touched the boy in any way. The require-
ment of a showing that the accident was caused by the
negligence or misconduct of the street car company, or its
employes, was hardly met by the testimony of the defend-
ant in error as to questions of fact, even conceding his
counsel's theory of the law to be correct. There was no
direct evidence that the motorman touched this boy. True,
the boy testified that he did, but he admits that he could
not, and did not know whether it was the motorman or
not. In this condition of his testimony certain circum-
stances have a great weight in showing that this lad mis-
takenly ascribed the blame for his misfortune to the motor-
man on the north-bound train, for his own statements were
that when he was thrown to the ground his face was up and
his head was toward the south. There is no conflict in the
evidence that both the north-bound train and the south-
bound train were in motion when the accident occurred.

This being true, if the motorman on the train northward-. bound caught this boy by the neck and threw him to the ground, the fall must have been in the direction in which said motorman himself was moving, and it was therefore unavoidable in such case that the boy's head should have been toward the north, probably with the face upward. If, on the other hand, the impelling force was moving southward, the boy would have fallen with his head toward the south. In the hurry of crossing to avoid the close approaching train from the south, and the confusion resulting. from finding himself suddenly between two trains moving in opposite directions, it was perhaps natural that this boy could scarcely understand how the swiftly following accident happened. That his impression that the motorman seized him was but conjecture is evident from his own statement; that in this conjecture he was mistaken, is quite obvious from the circumstances just noted. As there was no sufficient evidence to sustain the verdict the judgment of the district court is

REVERSED.